UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2026 JAN 27 A 10: 38

CLERK
BY _____
DEPUTY CLERK

CENTURY 21 FARM & FOREST            )
REALTY INC. and                     )
DANIEL MACLURE,                     )
                                    )
        Plaintiffs,                 )
                                    )
        v.                          )   Case No. 2:25-cv-00091
                                    )
MOUNT VERNON FIRE INSURANCE         )
COMPANY,                            )
                                    )
        Defendant.                  )

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**
(Doc. 25)

In Vermont Superior Court, on December 17, 2024, Century 21 Farm & Forest
Realty Inc. ("Century 21") and Daniel Maclure (collectively, "Plaintiffs") brought suit
against Mount Vernon Fire Insurance Company ("Mount Vernon"). Mount Vernon
removed the action to this court on January 24, 2025. (Doc. 1.) Plaintiffs seek a
declaratory judgment that Mount Vernon must defend and indemnify Plaintiffs in an
underlying state court civil suit (the "Underlying Suit") arising from alleged intentional
or negligent misrepresentations and violations of the Vermont Consumer Fraud Act by
Mr. Maclure, an agent of Century 21.

On May 30, 2025, Mount Vernon moved for summary judgment, seeking
judgment as a matter of law that it did not have a duty to defend Plaintiffs under Real
Estate Agents Errors and Omissions Liability Policy, Policy Number REA2550056I (the
"Policy"). (Doc. 25.) Plaintiffs opposed the motion on July 7, 2025, (Doc. 28), and
Mount Vernon replied on July 18, 2025, (Doc. 32), at which point the court took the
pending motion under advisement.

Plaintiffs are represented by Kevin E. Brown. Mount Vernon is represented by Cristina L. Dulay, Esq., and Steven J. Zakrzewski, Esq.

## I.    Whether to Consider Plaintiffs' Additional Facts.

In addition to submitting a response to Mount Vernon's Statement of Undisputed Facts, Plaintiffs submitted a Statement of Additional Facts ("SAF"). (Doc. 30.) The District of Vermont's Local Rule 56(b) provides that a party opposing summary judgment must respond to each paragraph of the moving party's statement of undisputed facts and the opposing party may:

> [i]f necessary, . . . include a separate and concise statement, in numbered paragraphs, of **additional material facts** that the opposing party contends cannot be genuinely disputed; if such additional facts are included, the moving party must respond to each such numbered paragraph within fourteen (14) days or when its response to any cross-motion is due, if later, in accordance with this rule. Each numbered paragraph in either party's statement may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the other party's statement.

(emphasis in original). Mount Vernon did not move to strike Plaintiffs' SAF but, rather, submitted a response, (Doc. 33), and noted in its reply that it "does not dispute the factual statements provided in Plaintiff[]s['] [SAF] that are material to [their] Summary Judgment Motion." (Doc. 32 at 1.) In resolving the pending motion, the court will therefore consider the SAF to the extent it contains material facts that are undisputed or identifies a genuine issue of material fact for trial.

## II.    The Undisputed Facts.

### A.    The Policy Issued to Century 21.

Mount Vernon issued Century 21 the Policy for a policy period of July 26, 2022, to July 26, 2023. The Policy provided professional liability insurance to the "Insured," defined as Century 21 and "any past or present partner, officer, director, employee[,] or independent contractor of [Century 21], solely while providing **Professional Services** on behalf of [Century 21.]" (Doc. 25-9 at 6) (emphasis in original) (internal quotation marks omitted).

2

The Policy's coverage applies to "any negligent act, error, omission, or **Personal Injury** committed . . . in the rendering or failure to render" real estate services during the policy period or after the retroactive date. *Id.* at 4 (emphasis in original). Coverage also applies to "all **Claims** arising out of any negligent act, error, omission, or **Personal Injury** committed by the **Insured** in the rendering or failure to render **Professional Services** for others" and "made against the **Insured** during the **Policy Period** or Extended Reporting Period, if any; and [] reported to the Company in writing no later than [sixty] days after the end of the **Policy Period** or, if applicable, during the Extended Reporting Period." *Id.* (emphasis in original) Coverage was subject to the following exclusions:

### VII. EXCLUSIONS

> A. This Policy does not apply to, and the Company will not defend or pay for, any **Claim** arising out of, directly or indirectly resulting from, based upon or in any way involving any actual or alleged: . . .
>
>> 3. violation of state, federal or governmental anti-trust, price fixing, restraint of trade or deceptive trade practice laws, rules or regulations committed by, at the direction of, or with the knowledge of any **Insured**; . . .
>>
>> 6. destruction of or loss of use of tangible property; however, this Exclusion shall not apply to **Claims** arising out of Lock Box coverage[.]

*Id.* at 7 (emphasis in original).

### B.    Mediation Preceding the Underlying Suit.

On or about December 22, 2022, Mount Vernon received a notice of claims asserted against Plaintiffs by Kevin Felder and Elizabeth St. John Felder (collectively, "the Felders") in connection with a real estate sale in which the Felders were the buyers and Plaintiffs represented the sellers. The Felders sent a demand letter for mediation (the "Demand Letter"), dated November 9, 2022, directed to an attorney and authored by the Felders' attorney. It stated as follows:

> The subject of the requested mediation relates to misrepresentations that Mr. Felder believes were made regarding the property he purchased at 2015 Creek Road in Albany, Vermont [(the "Property")]. It has come to Mr.

3

Felder's attention that the [P]roperty was significantly logged, in a manner that caused damage to the [P]roperty, during the summer prior to his purchase. He believes that the logging was contrary to the Forest Management Plan, and he has incurred damages including repairs to the [P]roperty, increased taxes for five (5) years due to involuntary removal from the current use taxation program, additional costs related to re-enrolling the [P]roperty in current use, and loss of trees that he should have owned upon purchasing the [P]roperty.

(Doc. 30-2 at 2-3.) An affidavit of Mr. Felder, dated December 9, 2022, (the "Felder Affidavit"), averred that:

3. At the time of the purchase, the Property was represented by [Mr. Maclure] to be enrolled in the current use program without qualification.

4. After the purchase, the Property was determined to have been logged within a few months prior to the transfer of title, contrary to the obligations of the applicable Forest Management Plan and Current Use Program requirements.

5. [Mr. Felder has] incurred significant financial damages as a result of the misrepresentations by [Mr. Maclure] related to the Property's Current Use Taxation Program status, including but not limited to repairs to the [P]roperty, increased taxes for five (5) years due to involuntary removal from the current use taxation program, additional costs related to re-enrolling the [P]roperty in current use, and loss of trees that [he] should have owned upon purchased the [P]roperty.

*Id.* at 6-7, ¶¶ 3-5.

Upon its receipt of the Demand Letter and the Felder Affidavit, Mount Vernon assigned Plaintiffs' claim number 0-20495 and designated Jessica Kolansky as the claim adjuster, who, in turn, hired Mark Hall, Esq., to defend Plaintiffs against the Felders' claims. Attorney Hall received the Demand Letter by January 25, 2023.

In February 2023, after reviewing the Policy's coverage, Ms. Kolansky discussed settlement strategy with Attorney Hall. Although Attorney Hall did not plan to participate in the mediation, he sought authority to settle for two to five thousand dollars in case he received a "call for help" from the sellers of the property (the "Seller Defendants"), who were also named in the Demand Letter. (Doc. 30-6 at 1.) Ms. Kolansky agreed that settling would be preferable but noted that any settlement would require Plaintiffs' consent and any settlement over $2,500 would be paid by the insurer.

4

Attorney Hall emailed the Felders' mediation statement (the "Mediation Statement") to Ms. Kolansky on April 6, 2023. The seven-page, fourteen-paragraph Mediation Statement described the misrepresentations Mr. Maclure allegedly made, the alleged misrepresentation in the Seller's Property Information Report form, the history of the Property, what the Felders knew and did not know at the time of their purchase, and nine categories of damages. In particular, the Mediation Statement claimed that:

> 3. [Mr. Felder] was not permitted to communicate directly with the Seller[] [Defendants] relative to the transaction.

> 4. Prior to purchasing the Property, [Mr. Felder] was informed by [Mr. Maclure] that the Property was enrolled in the "Current Use" program. [Mr. Maclure] showed [the Felders] a document that identified the areas exempt from Current Use restrictions, but [ninety-seven] acres were identified as being in the current use program.

> 5. Prior to the closing, although [Mr. Felder] could see that the Property had been logged, [he] was told by Mr. [Maclure] that the logging had been completed and the only activities continuing on the Property involved clean-up. The Property was unambiguously represented to [Mr. Felder] as being enrolled in the current use program, and continuing to qualify for current use after the closing. In fact, the logging apparently continued (in areas not easily viewable) after [the Felders] had [their] contract, and significantly more logging occurred than what was represented to [them] when [they] were told the logging had been completed.

> 6. Prior to the closing, the Property was represented to [the Felders] as having a working sugar shack with tubing, and when [Mr. Maclure] brought [them] into the sugar shack[,] he pointed out the fire wood used for sugaring, so it was clearly represented to [them] as a working sugaring operation. In fact, at closing when [they] learned that the Property had not been cleaned up as promised, and in consideration of [their] closing despite the failure of [Seller Defendants] to clean the Property[,] [the Felders] were told [they] could keep the wood in the sugar shack. [Mr. Felder] believe[s] Mr. [Maclure] intentionally misrepresented whether the sugaring operation was viable.

> 7. After the closing, [Mr. Felder] learned that all of the sugaring lines required replacement, contrary to the misrepresentations made to [him] prior to closing.

(Doc. 30-7 at 5-6, ¶¶ 3-7.) Other alleged misrepresentations concerned trash on the Property, an illegally buried driveway, and a contaminated groundwater spring and

5

compromised waterlines. The Felders sought damages for the loss of trees as well as the costs associated with the removal and remediation of trash and equipment from the Property.

Attorney Hall provided the following summary and analysis of the Mediation Statement to Mr. Maclure and Ms. Kolansky:

> Please see the attached [M]ediation [S]tatement from Mr. Felder. The mediation is scheduled for next Wednesday, but to this point we have opted not to participate until we had some better notion of the claims and the amounts. The claim came in quite high at $194,000, most of which is a claim for $150,000 in lost trees. No assessment is given regarding where this figure comes from; nor is the negotiated change i[n] price covered. Otherwise, the claims against [Century 21] relate[] to alleged statements about logging continuing, even after the [Purchase & Sale Contract] was signed; participation in the current use program; violations of the Forest Management Plan; the viability of a maple sugaring operation[]; and a dumpsite left on the [P]roperty. Most of it comes out of the Seller's Property Information Report. Some of it is difficult to associate with [Century 21].
>
> [Mr. Maclure], can you please review the [M]ediation [S]tatement, and we can discuss. We're not formally participants in the mediation at this point, but it is a [Z]oom meeting, and we should discuss whether it is possible for you to be available just in case. I left it with the [S]eller [Defendant]s' attorney that even if we didn't participate, I would try to be available if there was any possibility of getting rid of this matter for nuisance value. To this point, our reluctance in participating has been the [Felders'] previous unwillingness to provide us with an actual claim, guessing (correctly) that we'd be blindsided with something sky-high and unacceptable on the eve of the mediation, which would end up making the mediation a waste of time and money.
>
> I'm generally available to discuss tomorrow or early next week.

*Id.* at 2. On April 7, 2023, at Mount Vernon's direction, Plaintiffs paid the Policy deductible of $2,500 by check, which Mount Vernon cashed.

The mediation took place on April 12, 2023. Attorney Hall did not appear on behalf of Plaintiffs, and the mediation between the Seller Defendants and the Felders was unsuccessful. Following the mediation, Attorney Hall informed Ms. Kolansky that the Felders intended to file suit and that he expected them to file "causes of action" for

6

"negligent misrepresentation and consumer protection." (Doc. 30-9 at 1.) Thereafter,
Attorney Hall provided Mr. Maclure with legal advice regarding a possible settlement
offer, advising Mr. Maclure to "wait and see for a bit before going back to [the Felders]"
and recommending Mr. Maclure do "nothing for at least a couple of months." (Doc. 30-
10 at 1.) At no time during the mediation process did Mount Vernon limit its assumption
of the defense, reserve its rights to deny a defense or indemnity, reserve its right to raise
coverage defenses at a later date, or execute a bilateral nonwaiver agreement with
Plaintiffs.

## C.   Facts Alleged in the Underlying Suit.

On April 25, 2024, more than a year after the failed mediation, the Felders filed an
action against Plaintiffs and the Seller Defendants, claiming Plaintiffs and the Seller
Defendants made intentional or negligent material misrepresentations in the sale of the
Property. In their complaint, the Felders allege that, prior to closing, Plaintiffs and the
Seller Defendants represented that the Property was, and would continue to be, enrolled
in the Vermont Current Use Program "without qualification[,]" making the property
eligible for use value appraisal, a form of tax relief. (Doc. 25-10 at 5, ¶ 17.) The Felders
were informed prior to closing that "some logging" had occurred on the Property, but
"were not informed of the true extent of the logging." *Id.* at ¶ 20. The Felders allege,
however, that:

> In fact, the logging apparently continued (in areas not easily viewable) after
> the Purchase and Sale Contract had been executed, but after the closing
> [they] learned significantly more logging occurred than what was
> represented to them when they were told the logging had been completed.
>
> [] Prior to the closing, the Property was represented to [them] as having a
> working sugar shack with tubing, and when [Mr.] Maclure brought [them]
> into the sugar shack[,] he pointed out the fire wood used for sugaring, so it
> was clearly represented to [them] as a working sugaring operation.

*Id.* at 6, ¶¶ 30-31.

After closing on the Property, the Felders learned that the Property was no longer
eligible for the Vermont Current Use Program due to "extensive, illegal, and completely
inappropriate" logging that had occurred multiple times over the seven years preceding

7

the sale. *Id.* at 8, ¶ 43. The Felders also allege that Plaintiffs "knew or should have known" that the Seller Defendants cut down nineteen acres of sugar maple trees "and that all the plastic lines . . . were improperly disposed of at the Property[.]" *Id.* at 9, ¶ 54. The Felders claim that the Property "had not been cleaned up as promised," resulting in old cars, farm equipment, and "[o]ld oil, trash[,] and moldy hay" being left on the Property, and an "illegally buried old driveway that . . . had to be properly disposed of[.]" *Id.* at 7, ¶ 32, 10, ¶ 62. According to the Felders, Plaintiffs "were additionally aware prior to the sale, and failed to disclose, that the water[]line from the well was compromised and had a hole in it." (Doc. 25-10 at 9, ¶ 58.) Based on the Seller Defendants' alleged acts and omissions, the Felders asserted causes of action for intentional or negligent misrepresentation (Count I) and violations of the Vermont Consumer Fraud Act (Count II) and sought damages including, but not limited to, the cost of repairs to the Property, increased property taxes, costs to re-enroll the Property in the Vermont Current Use Program, and loss of trees.

### D.    Mount Vernon's Coverage Determination.

The Felders' attorney forwarded to Attorney Hall the complaint in the Underlying Suit and requested he accept service on behalf of Plaintiffs. Attorney Hall did not accept service, and on June 21, 2024, Mount Vernon denied Plaintiffs coverage for the Underlying Suit, stating that three exclusions, including Exclusions VIII(A)(3) and VIII(A)(6), excluded coverage.[1] According to Mount Vernon, Exclusion VIII(A)(3) excluded coverage of Count II because it "involves [an] alleged violation of the Vermont Consumer Fraud Act" and Exclusion VIII(A)(6) excluded coverage of Count I because it "arises out of the logging that occurred at the . . . [P]roperty and resulting loss of use[.]" (Doc. 25-12 at 4.) Plaintiffs subsequently retained E. William Leckerling, Esq., to defend them against the Felders' suit.

---

[1] Mount Vernon also denied coverage on the basis of Exclusion VIII(A)(17) but "is not moving for summary judgment with respect to its duty to defend based on this particular exclusion." (Doc. 25-4 at 6 n.1.)

III.    **Conclusions of Law and Analysis.**

A.    **Standard of Review.**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Clark v. Hanley*, 89 F.4th 78, 95 (2d Cir. 2023) (internal quotation marks omitted) (quoting *Kee v. City of New York*, 12 F.4th 150, 166-67 (2d Cir. 2021)). If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52.

9

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (citation and internal quotation marks omitted). Not all disputed issues of fact, however, preclude summary judgment. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## B.    Whether Mount Vernon Waived Its Right to Assert Policy Defenses.

> Waiver has sometimes been viewed as an issue of fact for the jury, particularly where acts and conduct are relied upon as the basis for a finding of waiver. Where the evidence of waiver is undisputed, however, the issue is one for the court. In [particular], where the evidence supporting waiver is derived from the insurance policy[] [and] correspondence between the parties, . . . the issue of waiver is ripe for summary judgment.

*Haley v. Cont'l Cas. Co.*, 749 F. Supp. 560, 566 (D. Vt. 1990) (internal citations omitted), *aff'd without op.* 927 F.2d 593 (2d Cir. 1991); *see also Cummings v. Conn. Gen. Life Ins. Co.*, 148 A. 484, 487 (Vt. 1930) ("Waiver is usually a question of fact, . . . [b]ut, where all the facts and circumstances are undisputed, the question is for the court."). "The burden of establishing a waiver is upon the party asserting it." *City of Burlington v. Hartford Steam Boiler Inspection and Ins. Co.*, 190 F. Supp. 2d 663, 680-81 (D. Vt. 2002) (internal quotation marks omitted) (quoting *Liberty Mut. Ins. Co. v. Cleveland*, 241 A.2d 60, 63 (Vt. 1968)). Here, Plaintiffs allege Mount Vernon waived any right to assert Policy exclusions.

"[W]aiver is the voluntary relinquishment of a known right[,]" *Id.* at 680 (quoting *Dunbar v. Farnum*, 196 A. 237, 241 (Vt. 1938)), and therefore requires "both knowledge and intent." *Farm Bureau Mut. Auto. Ins. Co. v. Houle*, 102 A.2d 326, 330 (Vt. 1954). "A party knows its right if the party has knowledge of all material facts. In the typical insurance case, the insurer must know of its right to assert either contractual or statutory defenses to the insured's right to recover under a policy." *Haley*, 749 F. Supp. at 566. "Waiver may be express or implied." *Id.* "If an insurance carrier, with knowledge of the facts and no effective reservation of its rights under the policy, takes charge of and

10

defends an action against the insured, it may not later deny its liability." *Boyer v. Am. Cas. Co.*, 332 F.2d 708, 711 (2d Cir. 1964).[2]

Plaintiffs argue that Mount Vernon waived its right to assert policy defenses when it engaged Attorney Hall during the mediation proceedings, granted Attorney Hall settlement authority, and instructed Plaintiffs to pay their Policy deductible. They claim Mount Vernon undertook these actions with knowledge of the Demand Letter and the Felder Affidavit and contemporaneously with its receipt of the Felders' detailed Mediation Statement. They cite the substantial overlap between the Mediation Statement and the complaint in the Underlying Suit as evidence that Mount Vernon had full knowledge of the operative facts. Mount Vernon counters that there can be no waiver because it was unaware of the material facts and could not know them until the complaint in the Underlying Suit was filed.

Mount Vernon characterizes facts regarding the mediation, including the Mediation Statement, as immaterial because it is the Underlying Suit that Mount Vernon is asked to defend. In so arguing, Mount Vernon relies on *Houle*, in which the Vermont Supreme Court held that an insurer did not waive its defenses because "the only thing done after the suit was brought was the entering of an appearance[,] . . . after such date the facts were investigated and then the insurer attempted to procure" a nonwaiver agreement. 102 A.2d at 328. Mount Vernon notes that, in this case, Attorney Hall did not even enter an appearance on behalf of Plaintiffs in the Underlying Suit.

In *Houle*, there was no apparent evidence that the insurer had "knowledge of the facts" and had "take[n] charge of and defend[ed] [the] action against the insured[.]" *Boyer*, 332 F.2d at 711. The insurer also promptly attempted to procure a nonwaiver agreement. In contrast, it is undisputed that Mount Vernon had knowledge of the facts

---

[2] *See also Beatty v. Emps.' Liab. Assurance Corp.*, 168 A. 919, 922-23 (Vt. 1933) ("'Waiver' and 'estoppel,' as applied to contracts of insurance, are terms which are interchangeably used, and in each case the meaning and result are the same. . . . Where a liability insurance company, with knowledge of the facts, and no effective reservation of its rights under its policy, takes charge of and defends an action against the insured, it is held to be estopped to deny its liability upon the ground that the risk was not covered.").

11

alleged at mediation, possessed the Felders' Mediation Statement, and granted Attorney Hall authority to settle the matter on its behalf within a designated monetary range. Moreover, the factual overlap between the Mediation Statement and the complaint in the Underlying Suit was so substantial that Mount Vernon fails to identify a single new fact alleged in the complaint.[3] Although Mount Vernon claims its investigation of the facts was ongoing, as evidenced by correspondence from Ms. Kolansky to Attorney Hall stating "we are reviewing a coverage question internally[,]" that coverage question was apparently resolved five hours later and apparently did not involve further investigation of the facts because Ms. Kolansky advised Attorney Hall that it was a "[f]alse alarm, everything checks out on our end." (Doc. 30-4 at 1-2.)

In the year between Mount Vernon's receipt of the Felders' Mediation Statement and the Felders' complaint in state court, Mount Vernon took no action to assert or reserve a defense to coverage or to procure a nonwaiver agreement, despite Attorney Hall informing Mount Vernon on April 12, 2023, that the Felders "indicated they plan on filing suit[]" and he expected the causes of action to "be negligent misrepresentation and consumer protection." (Doc. 30-9 at 1.) Mount Vernon cites no evidence of a factual investigation it undertook in the interim. Instead, during that time period, Attorney Hall provided legal advice to Plaintiffs on settlement strategy and advised Mr. Maclure in April 2023 not to make a settlement offer. Although Attorney Hall did not formally

---

[3] For example, in both the Mediation Statement and the complaint in the Underlying Suit, the Felders allege Plaintiffs made misrepresentations regarding the Property's current and continued enrollment in the Vermont Current Use Program. *Compare* Doc. 30-7 at 5, ¶ 5 ("The Property was unambiguously represented to [Mr. Felder] as being enrolled in the current use program, and continuing to qualify for current use after the closing. In fact, . . . significantly more logging occurred than what was represented to [the Felders] when [they] were told the logging had been completed."), *with* Doc. 25-10 at 5-6, ¶¶ 24, 29 ("After the closing, [the Felders] learned that the Property was so extensively logged that it could no longer remain enrolled in the Current Use Program. . . . The Property was unambiguously represented to [the Felders] by [Plaintiffs] as being enrolled in the current use program, and continuing to qualify for current use after the closing."). The Mediation Statement and complaint also both allege Plaintiffs knew the Seller Defendants had "cut all the maple[ trees] down[.]" *See* Doc. 30-7 at 7, ¶ 13; Doc. 25-10 at 9, ¶ 54.

12

appear on behalf of Plaintiffs, these affirmative acts by Mount Vernon distinguish this
case from an effort to construe mere silence as a waiver. *See, e.g., Kanaan v. Kanaan*, 659
A.2d 128, 136 (Vt. 1995) ("[W]aiver is not created by mere oversight and cannot be
inferred from silence. Instead, waiver requires proof of a voluntary and intentional
relinquishment of a known and enforceable right.") (internal citation omitted); *Reynolds
v. John Hancock Life Ins. Co.*, 97 A.2d 121, 126 (Vt. 1953) ("Silence, alone, is never a
waiver.") (citing *Dunbar*, 196 A. at 241).

Viewing the facts in the light most favorable to Plaintiffs, Mount Vernon acted
affirmatively to defend and advise Plaintiffs without a reservation of rights, supporting a
conclusion that a waiver occurred. Plaintiffs, however, raised the issue of waiver in their
opposition to Mount Vernon's motion for summary judgment and do not cross move for
summary judgment on the issue of waiver. Against this backdrop, the court declines to
find as a matter of law that Mount Vernon waived its right to assert policy defenses.

## C.    Whether Defendant Has a Duty to Defend.

"An insurer's duty to defend . . . is broader than its duty to indemnify." *Garneau v.
Curtis & Bedell, Inc.*, 610 A.2d 132, 134 (Vt. 1992). The duty to defend applies
"whenever it is clear that the claim against the insured might be of the type covered by
the policy[,]" *id.*, whereas the duty to indemnify arises only when there is a covered loss
or injury. *See Co-op. Ins. Cos. v. Woodward*, 2012 VT 22, ¶ 11, 191 Vt. 348, 353, 45 A.3d
89, 93 (holding that "[i]f a claim is made or a suit is brought against an insured for
damages . . . , there is coverage under the policy, unless an exclusion applies.") (internal
quotation marks and citation omitted).

If there is no duty to indemnify as a matter of law, there is no duty to defend
because "there is no possible factual or legal basis on which [the insurer] might
eventually be obligated to indemnify[.]" *Garneau*, 610 A.2d at 134 (internal quotation
marks and citation omitted). "If any claims are potentially covered by the policy, the
insurer has a duty to defend." *City of Burlington v. Nat'l Union Fire Ins. Co.*, 655 A.2d
719, 721 (Vt. 1994) (citing *Garneau*, 610 A.2d at 134). The duty to defend, however, is
only an "initial duty" and exists "as long as the possibility of coverage exists[.]" *Vt. Gas*

*Sys., Inc. v. U.S. Fid. & Guar.*, 151 F.R.D. 268, 271 (D. Vt. 1993). In analyzing an insurer's duty to the insured, the "court must focus on the factual allegations of the underlying complaint, and not on the legal theories asserted." *Murphy v. Acceptance Indem. Ins. Co.*, 788 F. Supp. 2d 332, 335 (D. Vt. 2011) (internal quotation marks and citation omitted); *TBH ex rel. Howard v. Meyer*, 716 A.2d 31, 34 (Vt. 1998) ("We must focus on the factual allegations in [the] complaint and not on the legal theories asserted, and unless the complaint alleges facts within the coverage of the policies, [the insurer] has no duty to defend or indemnify.").

The Policy defines "**Claim(s)**" as:

> a demand received by the **Insured** for money, including the service of suit or institution of arbitration proceedings against the **Insured**, alleging a negligent act, error, omission[,] or **Personal Injury** of the **Insured** in the rendering or failure to render **Professional Services**. **Claim** does not include proceedings seeking injunctive or other non-pecuniary relief or administrative proceedings before any national, state, regional[,] or local board of real estate agents or any committee or sub-committee thereof[.]

(Doc. 25-9 at 6) (emphasis in original). This definition squarely includes a demand letter received by the insured as well as service of suit. On or about December 22, 2022, Mount Vernon received a notice of claims asserted against Plaintiffs by the Felders and assigned Plaintiffs a claim number. Thereafter, Mount Vernon received the Demand Letter and Mediation Statement, which made a demand for money from Plaintiffs. Mount Vernon instructed Plaintiffs to pay their deductible and Plaintiffs did so. Mount Vernon then cashed Plaintiffs' deductible check. After mediation was unsuccessful, the Felders filed the complaint in the Underlying Suit, again seeking monetary damages from Plaintiffs. Absent a policy exclusion, Mount Vernon thus has a duty to defend Plaintiffs.

## 1.    Whether Exclusion VIII(A)(6) Excludes Coverage.

Under Vermont law, "[t]he proper construction of language in an insurance contract is a question of law[.]" *Trinder v. Conn. Att'ys Title Ins. Co.*, 2011 VT 46, ¶ 11, 189 Vt. 492, 496, 22 A.3d 493, 496 (citation omitted). "An insurance policy is construed according to its terms and the evident intent of the parties as expressed in the policy language." *Rainforest Chocolate, LLC v. Sentinel Ins. Co., Ltd.*, 2018 VT 140, ¶ 6, 209

Vt. 232, 235, 204 A.3d 1109, 1111 (internal quotation marks and citation omitted). Courts must "review the language of an insurance contract from the perspective of what a reasonably prudent person applying for insurance would have understood it to mean." *Woodward*, 2012 VT 22 at ¶ 9, 191 Vt. at 352-53, 45 A.3d at 93 (internal quotation marks and citation omitted).

Where an insurance policy's terms "can be reasonably or fairly susceptible of different constructions[,]" those terms are ambiguous. *Chamberlain v. Metro. Prop. & Cas. Ins. Co.*, 756 A.2d 1246, 1248 (Vt. 2000) (internal quotation marks and citation omitted). "[T]he determination of ambiguity is a question of law," and "[a]ny ambiguities in insurance policies are construed in favor of finding coverage." *DeBartolo v. Underwriters at Lloyd's of Lond.*, 2007 VT 31, ¶ 9, 181 Vt. 609, 611, 925 A.2d 1018, 1022 (citation omitted). "However, the fact that a dispute has arisen as to proper interpretation does not automatically render the language ambiguous[,]" and courts "will not deprive the insurer of unambiguous terms placed in the contract for its benefit." *Rainforest Chocolate*, 2018 VT 140 at ¶ 7, 209 Vt. at 236, 204 A.3d at 1111 (internal quotation marks and citations omitted).

"As a general rule, the insurer has the burden of proving that an exclusionary clause applies to bar coverage." *Nationwide Mut. Fire Ins. Co. v. Petty*, 923 F. Supp. 63, 65 (D. Vt. 1996) (applying Vermont law); *see also Vill. of Morrisville Water & Light Dep't v. U.S. Fid. & Guar. Co.*, 775 F. Supp. 718, 725 (D. Vt. 1991) ("Insurers, seeking to avoid their duty to defend, must show that a third party's claim against the insured is entirely excluded from coverage.") (citing *City of Burlington v. Glens Falls Ins. Co.*, 340 A.2d 89, 90 (Vt. 1975)). "An exclusionary clause must be strictly construed against the insurer as its drafter." *Prop. & Cas. Ins. Co. of Hartford v. Davenport*, 907 F. Supp. 2d 561, 565 (D. Vt. 2012) (citing *Petty*, 923 F. Supp. at 66).

"The duty to defend is contractual[]" and thus dependent on "the language of the policy[.]" *City of Burlington, Vt. v. Arthur J. Gallagher & Co.*, 944 F. Supp. 333, 335-36 (D. Vt. 1996). Where both covered and non-covered claims are present in a lawsuit, however, the duty to defend extends to the entire suit. *See R.L. Vallee, Inc. v. Am. Int'l*

2:25-cv-00091-cr    Document 38    Filed 01/27/26    Page 16 of 22

*Specialty Lines Ins. Co.*, 431 F. Supp. 2d 428, 440 (D. Vt. 2006) ("[O]nce the insurer's duty to defend is triggered, the insurer must defend the entire suit including any claims that might not be covered by the policy.").

> ### a.    Whether the Claim Involves "the Destruction of or Loss of Use of Tangible Property."

Exclusion VIII(A)(6) excludes coverage of "any **Claim** arising out of, directly or indirectly resulting from, based upon or in any way involving any actual or alleged . . . destruction of or loss of use of tangible property[.]" (Doc. 25-9 at 6) (emphasis in original). The Policy does not define the term "tangible property." Mount Vernon contends "tangible property" encompasses trees, while Plaintiffs assert that trees are real property. "Disputed terms should be read according to their plain, ordinary[,] and popular meaning." *Nat'l Union Fire*, 655 A.2d at 721.

In its motion, Mount Vernon relies on Black's Law Dictionary's definition of "tangible personal property" as "personal property that can be seen, weighed, measured, felt, touched, or in any other way perceived by the senses, examples being furniture, cooking utensils, and books." *Property: Tangible Personal Property*, Black's Law Dictionary (12th ed. 2024). The Policy, however, employs the term "tangible property," not "tangible personal property." Black's Law Dictionary defines "tangible property" as "[p]roperty that has physical form and characteristics[,]" *Property: Tangible Property*, Black's Law Dictionary (12th ed. 2024), and Merriam-Webster Dictionary defines it as "property that has a tangible and corporeal existence and intrinsic economic value because of it[.]" *Property: Tangible Property*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/property (last accessed Jan. 23, 2026). Black's Law Dictionary defines real property as "[l]and and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land. Real property can be either corporeal (soil and buildings) or incorporeal (easements)[,]" *Property: Real Property, Black's Law Dictionary* (12th ed. 2024),[4] while

---

[4] *See also Property: Real Property*, Black's Law Dictionary (12th ed. 2024) (real property "means primarily land, and everything which is naturally a part of the land, or is more or less

16

Merriam-Webster Dictionary defines it as "property consisting of land, buildings, crops, or other resources still attached to or within the land or improvements or fixtures permanently attached to the land or a structure on it[.]" *Property: Real Property*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/property (last accessed Jan. 23, 2026). In their Mediation Statement as well as their complaint, the Felders complained that they were deprived of growing trees, not the resulting timber.

"The law in Vermont has been clear for many years that growing trees are real estate." *State v. Dragon*, 349 A.2d 720, 722 (Vt. 1975) (citing *Univ. of Vt. v. Ward*, 158 A. 773, 784 (Vt. 1932)). The Vermont Supreme Court, however, has not treated real property and tangible property as mutually exclusive, finding that a comprehensive general liability ("CGL") policy covering "physical injury to or destruction of tangible property" applied to groundwater.[5] *Towns v. N. Sec. Ins. Co.*, 2008 VT 98, ¶ 21, 184 Vt. 322, 338, 964 A.2d 1150, 1161 (2008). The Vermont Supreme Court accorded the policy language "its plain, ordinary meaning consistent with the reasonable expectations of the insured," and construed ambiguous terms in favor of coverage to determine that the policy covered contaminated groundwater. *Id.*; *see also State v. CNA Ins. Cos.*, 779 A.2d 662, 669 (Vt. 2001) (finding that "oil pollution to water is injury to tangible property") (internal quotation marks omitted) (quoting *Port of Portland v. Water Quality Ins. Syndicate*, 796 F.2d 1188, 1194 (9th Cir. 1986)); *Vill. of Morrisville,* 775 F. Supp. at 729 (interpreting a CGL policy and holding that soil and water are "certainly 'tangible property[]'"). This

permanently added to it. Trees . . . are all classed as real property so long as they remain a part of the land, but if the trees are cut down . . . they cease to be real property and become personalty.") (quoting William J. Grange, *Real Estate: A Practical Guide to Ownership, Transfer, Mortgaging, and Leasing of Real Property* 3 (1937)).

[5] Although not directly analogous, the Vermont Supreme Court has held that a license to take water is a license to real property, thereby treating a natural resource as an interest in real estate. *See, e.g., Bergeron v. Forger*, 214 A.2d 85, 88 (Vt. 1965) ("The right to take water from a water system was held by this Court to be in itself an interest in real estate.") (citing *Vill. of Brattleboro v. Yauvey*, 143 A. 295, 296 (Vt. 1928)); *Clement v. Rutland Country Club*, 108 A. 843, 844 (Vt. 1920) (holding that an interest in a water source like a stream or spring is "an interest in the real estate itself[]").

17

interpretation is consistent with other courts that have found damage to trees constitute damage to "tangible property" under CGL policies. *See, e.g., Marley Orchard Corp. v. Travelers Indem. Co.*, 750 P.2d 1294, 1297 (Wash. Ct. App. 1988) (finding that injury to trees constituted property damage, defined under the CGL policy as "physical damage to tangible property[,]" and therefore fell within coverage of the policy); *Lebowitz v. Amica Mut. Ins. Co.*, 2013 WL 4734742, at \*7 (Conn. Super. Ct. Aug. 8, 2013) (concluding that cutting down trees qualified as "physical injury to, destruction of, or loss of use of tangible property" under a CGL policy and fell within the policy's coverage) (internal quotation marks omitted); *Haimbaugh v. Grange Mut. Cas. Co.*, 2008 WL 3198723, at \*8 (Ohio Ct. App. Aug. 7, 2008) (same).

Because the Policy is not a CGL policy but, rather, a real estate agent errors and omissions policy, Plaintiffs argue that "words can take on different meanings in different contexts." *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 93 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Am. Home Assurance Co. v. Republic Ins. Co.*, 984 F.2d 76, 78 (2d Cir. 1993)). They argue that it does not comport with the reasonable expectations of an insured to interpret "tangible property" broadly and find it applies to growing trees. Instead, they contend that the term "tangible property" is ambiguous.

"[I]nsurance policy exclusions are to be strictly and narrowly construed[.]" *City of Burlington v. Ass'n of Gas & Elec. Ins. Servs., Ltd.*, 751 A.2d 284, 289 (Vt. 2000) (citing *Gerrish Corp. v. Universal Underwriters Ins. Co.*, 947 F.2d 1023, 1029-30 (2d Cir. 1991)). "Although the contract is to be strictly construed against the insurer, 'if clear and unambiguous, the provisions of the contract must be given force and effect and be taken in their plain, ordinary[,] and popular sense.'" *Rassman v. Am. Fid. Co.*, 460 A.2d 461, 463 (Vt. 1983) (alteration adopted) (quoting *Noyes v. Com. Travelers*, 215 A.2d 495, 497 (Vt. 1965)). While application of the plain, ordinary, and popular meaning of "tangible property" may render the exclusion broader, it does not render it ambiguous. *See, e.g., Harristown Dev. Corp. v. Int'l Ins. Co.*, 1988 WL 123149, at \*6 (M.D. Pa. Nov. 15, 1988) ("The phrase 'tangible property' [in an insurance policy exclusion] is certainly broad enough to cover real property as well as personal property.").

Plaintiffs point out that other exclusions in the Policy specifically refer to "real property" and "real estate," indicating Mount Vernon knew how to refer to real property when it wanted to and could have used that language in Exclusion VIII(A)(6) if it sought to exclude all destruction of or loss of use of real property. For example, Exclusion VIII.A.20 excludes claims which arise directly or indirectly from "real property appraised, controlled, managed, operated, purchased[,] or sold by an **Insured**[.]" (Doc. 25-9 at 8) (emphasis in original). Exclusions VIII(C)(1) and VIII(C)(2) similarly concern claims related to "real estate." While this may be true, the Policy does not equate "real property" with "tangible property," and the plain meaning of the latter term is broader than the former.[6] Trees are "tangible property" because they have a "physical form and characteristics[.]" *Bascuñán v. Elsaca*, 874 F.3d 806, 820 n.55, (2d Cir. 2017) (concluding that money in a bank account was "tangible property") (citing *Property: Tangible Property*, Black's Law Dictionary (10th Ed. 2014)); *see also Abbatiello v. Wells Fargo Bank, N.A.*, 2015 WL 5884797, at *2 (E.D.N.Y. Oct. 8, 2015) ("Tangible property is that which may be felt or touched and is either real or personal property.").

Plaintiffs alternatively argue that Exclusion VIII(A)(6) does not exclude coverage because it applies to the "destruction of or loss of use of tangible property[,]" and logging is instead a conversion of property. (Doc. 25-9 at 7.) According to the plain meaning of the term, "logging" is the process of cutting and processing growing trees into logs or other forest products. *Log*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/log (last accessed Nov. 20, 2025) ("to cut (trees) for lumber[;] [] to clear (land) of trees in lumbering"). Claims from the Underlying Suit arising from the illegal logging of trees therefore arise out of the destruction of or loss of use of tangible property.

---

[6] *Compare Real*, OXFORD ENG. DICTIONARY, https://www.oed.com/dictionary/real_adj2 (last accessed Jan. 23, 2026) ("Being or consisting of immovable property, such as land and anything erected on or attached to this."), *with Tangible Property*, OXFORD ENG. DICTIONARY, https://www.oed.com/dictionary/tangible-property_n (last accessed Jan. 23, 2026) ("Property (such as gold, real estate, and personal possessions) which has a physical existence[.]").

### b.    Whether the Claim is "Arising Out Of" the Destruction of or Loss of Use of Tangible Property.

In the context of an insurance policy, the "phrase 'arising out of' is very broad and comprehensive, requiring only that there be some causal relationship between [an] injury and [the] risk for which coverage is provided[]." *State Farm Mut. Auto. Ins. Co. v. Roberts*, 697 A.2d 667, 672 (Vt. 1997) (citation omitted); *see also United Nat'l Ins. Co. v. Penuche's, Inc.*, 128 F.3d 28, 31 (1st Cir. 1997) (observing that "[u]nder New Hampshire law, 'arising out of' is a very broad term meaning 'originating from or growing out of or flowing from[]'") (citation omitted); *Koscinski v. Farm Fam. Cas. Ins. Co.*, 346 F. Supp. 3d 248, 254 (D. Conn. 2018) (noting that under Connecticut law, "it is sufficient to show only that the accident or injury was connected with, had its origins in, grew out of, flowed from, or was incident to [an] occurrence"). Relying on the broad construction of the phrase "arising out of," Mount Vernon asserts that Exclusion VIII(A)(6) "unambiguously" excludes coverage of the Underlying Suit because the claims in the Underlying Suit arise "solely" out of the destruction or loss of use of tangible property, specifically trees and plastic lines used in maple sugaring. (Doc. 25-4 at 10, 12.)

However, not all of the Felders' claims arise out of the destruction or loss of use of trees and plastic tubing. The Felders further allege a failure to remove trash and equipment, an allegedly illegally buried driveway, and the need to remove a dilapidated sugarhouse, claims that do not arise out of the "destruction of or loss of use of tangible property." These claims are therefore not barred by Exclusion VIII(A)(6).

Notwithstanding Mount Vernon's contention that "the alleged misrepresentations regarding the trees are the crux of the claims[,]" other claims remain present in the Underlying Suit. (Doc. 32 at 8.) Unless another exclusion applies, the presence of these covered claims would extend the duty to defend to the entire complaint in the Underlying Suit.

### 2.    Whether Exclusion VIII(A)(3) Excludes Coverage.

Exclusion VIII(A)(3) excludes coverage of "any **Claim** arising out of, directly or indirectly resulting from, based upon or in any way involving any actual or alleged . . .

20

violation of state . . . deceptive trade practice laws, rules[,] or regulations[.]" (Doc. 25-9 at 6) (emphasis in original). Mount Vernon argues that this exclusion excludes coverage of Count II in the Underlying Suit, which asserts claims under the Vermont Consumer Fraud Act. Plaintiffs do not contest that claims under the Vermont Consumer Fraud Act are excluded but argue that Mount Vernon has waived its right to assert that exclusion and that, even if waiver is not found, the duty to defend remains because other claims alleged in the Underlying Suit are not barred by the Policy.

The Vermont Consumer Fraud Act prohibits "[u]nfair methods of competition in commerce[.] and unfair or deceptive acts or practices in commerce[.]" 9 V.S.A. § 2453(a). The "express statutory purpose of the Act is to 'protect the public' against 'unfair or deceptive acts or practices.'" *Carter v. Gugliuzzi*, 716 A.2d 17, 21 (Vt. 1998) (quoting 9 V.S.A. § 2451). In Count II of the Underlying Suit, the Felders allege:

> 70. At all times relevant hereto, [Plaintiffs] were regularly engaged in the business of selling real estate.
>
> 71. At all times relevant hereto, [the Felders] were "consumers" pursuant to 9 V.S.A. § 2451a (2024)[.]
>
> 72. At all time[s] relevant hereto, [Plaintiffs] engaged in unfair and deceptive acts in commerce. 9 V.S.A. § 2453 (2024).
>
> 73. The [Plaintiffs'] unfair and deceptive acts in commerce directly and proximately caused financial damages to [the Felders] in an amount to be proven at trial.

(Doc. 25-10 at 12.) The Vermont Consumer Fraud Act is a state deceptive trade practice law, thus claims arising from its violation, like those in Count II of the Underlying Suit, are barred by Exclusion VIII(A)(3).

However, because some claims alleged in Count I of the Underlying Suit, including the alleged intentional or negligent misrepresentation of the failure to remove trash and equipment, an illegally buried driveway on the Property, and the need to remove a dilapidated sugarhouse, are not excluded by Policy Exclusions VIII(A)(3) or VIII(A)(6), Mount Vernon "has a duty to defend[,]" *Nat'l Union Fire*, 655 A.2d at 721, that extends to the entire suit. *See R.L. Vallee*, 431 F. Supp. 2d at 440.

21

## CONCLUSION

For the foregoing reasons, the court DENIES Mount Vernon's motion for summary judgment. (Doc. 25.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 27ᵗʰ day of January, 2026.

Christina Reiss, Chief Judge
United States District Court